CITY NATIONAL BANK OF MARSHALLTOWN, IOWA, Appellant, v. M. CRAHAN, M. E. MELVIN, and J. H. CHARLTON, ADMINISTRATOR OF THE ESTATE OF M. CRAHAN, DECEASED, Defendants, F. H. HELSELL, INTERVENER, Appellee.

**Equitable liens:** ABANDONMENT. The levy of an attachment upon a debtor's property operates as an abandonment of any equitable lien the creditor may have thereon.

**Attachment:** CLAIM BY THIRD PERSON: EVIDENCE. Where the evidence, although conflicting, is such as to support the finding of the trial court its conclusion will be sustained on appeal. In the instant case the evidence is held to support a finding that intervener's right to attached property was superior to that of plaintiff at the time of the attachment.

**Same:** RIGHTS ACQUIRED BY ATTACHMENT. An attaching creditor obtains only such rights as his debtor had in the property at the time of the attachment, even as against an equitable right in another, though unrecorded.

**Evidence:** TRANSACTIONS WITH ONE SINCE DECEASED. In an action by an attaching creditor against the administrator of a deceased debtor, an intervener claiming the property is not disqualified to testify concerning transactions with decedent.

Intervention: BURDEN OF PROOF. The intervener in an attachment suit has the burden of showing that the property belongs to him.

Trusts: EVIDENCE. Where an intervener claiming attached real property has paid the purchase price therefor or has gone into possession, proof of either fact is not objectionable, as establishing a parol trust in land.

*Appeal from Marshall District Court.*— HON. OBED CASWELL, Judge.

#### WEDNESDAY, JULY 3, 1907.

ACTION upon a promissory note executed by M. Crahan and M. E. Melvin, and upon an account at one time held by Melvin against Crahan and by Melvin guaranteed and assigned to the bank.   The action was aided by an attachment, which was levied upon certain real property in the city of Marshalltown as the property of defendant, Crahan.   During the pending of the proceedings, Crahan died, and his administrator was substituted. as a defendant.  F. H. Helsell intervened, claiming that the attached property belonged to him.   Issue was joined on his petition, and the main case with the intervention was tried to the court, a jury being waived, resulting in a judgment finding that the attached property belonged to intervener at the time attachment was levied and releasing and discharging the attachment thereon.  · Plaintiff appeals.— *Affirmed.*

*Theo. F. Bradford,* for appellant.

*Anthony C. Daly,* for appellee, Melvin.  *Binford, Snellinger & Farber* and *F. H. Helsell,* for other appellees.

DEEMER, J.— Whilst many questions were presented to the trial court during the course of the proceedings .before it, the only ones which are involved upon this .appeal relate to the judgment rendered on the petition of interven-

tion of F. H. Helsell. If there be error in that, then the judgment should be reversed, and the cause remanded for further proceedings against the attached property. On the other hand, if the judgment upon the petition of intervention be sustained, the case should be affirmed, for there is no claim that the court erred in failing to render judgment against Melvin or the administrator of Crahan's estate. We therefore go directly to the issue as tendered by intervener's petition, wherein he claimed to be both the legal and equitable owner of the attached property at the time the writ was levied upon it.

Helsell came into the case in virtue of section 3928 of the Code, which provides for intervention by any person other than defendant who has a claim to the property attached or an interest in or lien upon it, and for a summary hearing of the petitioner's claim. The section provides that the court may hear the proof, order a reference, or may impanel a jury to inquire into the facts, and that, if it be found that petitioner has a title to, a lien upon, or any interest in, the property, such order shall be made as is necessary to protect his rights. The trial court found that the property attached belonged to intervener, and it was ordered released and discharged from the lien of the attachment.

While something is said in the original petition, and also in argument, about plaintiff having some kind of an equitable lien or right to the attached property in virtue of 1. EQUITABLE LIENS: abandonment. an alleged agreement between the bank and Crahan, no reliance seems to have been placed thereon, and, the petition itself shows that this lien, if there ever was one, was abandoned not only by the acceptance of another agreement in lieu of the one alleged to give a second mortgage upon the property attached to secure the debt owing to the bank by Crahan, but by reason of the levy of an attachment upon the very property on which the second mortgage was to be given,— the assertion of

which remedy amounted to an abandonment of the so-called equitable lien. *Lawrence v. McKenzie,* 88 Iowa, 432.

The question in the case, then, is: Did Crahan have such an interest in the attached property at the time the levy was made as that his levy should take priority over the claim of intervener thereto ? · Incident to this are some minor questions of law, which we shall dispose of during the course of the opinion. Plaintiff established Crahan's indebtedness to it upon a note for *$450, with interest from April 24, 1904, and also showed a conveyance of the attached property to Crahan by deed from Delano Smith and wife for the expressed consideration of $5,500, dated December 19, 1903, and filed for record February 18, 1904. It also showed the levy of the attachment writ thereon on March 8, 1904. So that the record title was in Crahan at the time the writ was levied. The only other deed of record in the chain of title to the attached property material to our inquiry is one from M. Crahan and wife to intervener Helsell of date March 14, 1904, and filed for record March 16, 1904, for the expressed consideration of $1 and subject to a mortgage of $2,000. If this were all, undoubtedly the judgment of the trial court should be reversed.

2. ATTACHMENT: claim by third person: evidence.

But it appears that Helsell held both the legal and equitable title to three hundred and twenty acres of land in the State of Kansas and other property as security for a large indebtedness due Helsell and another, from Crahan, and that this Kansas property was traded to Delano T. Smith for the property attached in this case; Helsell and wife making the deed therefor at the suggestion of Crahan to Smith over date February 8, 1904, which deed was for the express consideration of $6,750, and was filed for record February 18, 1904. Intervener claims that Crahan and Smith worked up the exchange of the Kansas land for the attached property, and that he (Helsell), holding both the legal and equitable title to the Kansas land, consented to the

exchange for the reason that $2,000 could be borrowed upon the attached property, and the proceeds thereof turned over to him in liquidation of so much of Crahan's indebtedness to him, and that the deed to the attached property should run either from Smith to him (Helsell) or from Smith to Crahan, and immediately from Crahan to this intervener; the idea being that it was simply a change of securities, whereby intervener would receive $2,000 in cash in addition to the legal title to the Marshalltown property as security for Crahan's indebtedness in lieu of the Kansas land. It also appears that Smith was to pay something in addition to the attached property for the Kansas land. Helsell claims that the arrangements between Crahan and Smith culminated on or about February 8, 1904, and that on that day he and his wife executed the deed to the Kansas lands, which was not delivered to Smith until February 18, 1904, at which time the agreement was fully consummated. He further says that he went to Marshalltown on Feburay 18th with the deed to Smith for the Kansas land and another deed partially executed from Crahan and wife to him (Helsell) for the Marshalltown property; that when he reached Marshalltown it was discovered that Crahan's wife was not there, and it was suggested that to obtain the $2,000 loan upon the attached property Smith and wife should deed the Marshalltown property to Crahan, and he (Crahan) would execute a purchase-money mortgage back to Smith, and Smith was to assign this mortgage to plaintiff bank, which, on its own behalf, or for another, it had agreed to take as security for a $2,000 loan upon the premises, and Crahan was to take the deed which had been prepared for him and his wife to sign running to Helsell, obtain his wife's signature, and return the same to Helsell; it being the agreement according to intervener, that Crahan should pay the $2,000 borrowed upon the property to him (Helsell), and then give him a deed for the property subject to the mortgage; as he (Helsell) objected to making any mortgages in his own name.

It is in testimony that these arrangements were all carried out, and that Helsell took possession of the Marshalltown property and has held it ever since. The deed from Crahan and wife to Helsell was not fully executed and delivered until March 14, 1904, which was some days after the attachment was run. Helsell says that he received all of the $2,000 borrowed from plaintiff, except the sum of $868, which he paid to Crahan. Smith was to pay, as we have said, $1,200 in addition to the town property for the Kansas land. There is some confusion in the record as to who received this $1,200 — whether Crahan or intervener — but intervener says that at no time did he receive from Crahan more than the $2,000 less the amount he gave Crahan to meet some personal bills.

On the other side, we have a much different version of the matter. It seems that Melvin was on Crahan's note to the bank, the one in suit herein, and that Crahan promised Melvin that, if he (Melvin) would get him a loan of $2,000 on the Marshalltown property, he (Crahan) would take care of this note. That Melvin applied to the bank for the loan and was promised the sum of $2,000 as a loan for the purpose of getting the note in suit paid, but the bank said it would hold Melvin responsible. This was before Helsell appeared upon the scene. Melvin says that when Helsell appeared he objected to Crahan's having any of the money, and he (Melvin) then said that before he would allow the money to be paid over to Helsell he (Helsell) should allow Crahan to have the Marshalltown property as his own, and that upon these conditions he went ahead, agreeing that Helsell should have the $2,000 borrowed upon the understanding and agreement that the bank should have a second mortgage upon the property in dispute to take care of the obligation now in suit. It is not claimed that Crahan ever made this second mortgage; but it is in testimony that he thereafter agreed to secure the indebtedness in suit by a second mortgage upon some South Dakota land. Melvin testified that

Helsell received the $2,000 from the loan and the $1,200 which Smith agreed to give for the Kansas land and that Helsell agreed to make no claim to the Marshalltown property. It is also in testimony that Melvin gave a check to Helsell for $583.25 in addition to the aggregate of the loan and "boot money," which it is claimed was to equalize the mortgage upon the premises; that is to say, in order that Smith might have his Kansas land free of incumbrance. Melvin says that he never heard of the deed from Crahan to Helsell, and that nothing was said about it in his presence at the time the transaction was closed.

It further appears, however, that Melvin worked up the trade between Crahan and Smith, that he was entitled to or was claiming a commission therefor, and was also interested in getting the note in suit settled. The bank officials testified that they heard nothing about the deed from Crahan and wife to Helsell; that the loan upon the Marshalltown property was an accommodation to Melvin to assist him in securing Crahan's debt upon the note now in suit; and that when the loan was made it was agreed by Crahan that he (Crahan) would give a second mortgage upon the Marshalltown property to secure the note upon which this action is based. The officer giving the testimony does not say whether Helsell was present and knew of this arrangement or not. This official testified to a change in the form of mortgage, so that Crahan's wife would not have to sign it, but that he never heard at any time that Helsell owned the Kansas land. He further testified that the bank had little to do with the $2,000 mortgage, and that it furnished the money to accommodate Melvin. He also said that he understood that the mortgage to secure the $2,000 was to be executed by Crahan, and that the change was made on Helsell's advice. The bank seemed to be interested only in its security for the $2,000, and it does not claim through its officers that Helsell knew anything about the claimed agreement between Melvin and Crahan with reference to the second mortgage. It does appear,

however, that this fell through, and that Crahan then proposed to give a second mortgage upon some South Dakota land, which the bank refused to accept, because of no value.

This presents a summary of the testimony upon which the case was decided.   The witnesses were each and all before the trial court, who had the benefit of their appearance and presence.   The bank does not seem to have had much part in any of the negotiations, and appeared to be concerned only with its security for the $2,000 loan upon the property; and, even as to this matter, it held Melvin personally responsible, and accepted intervener's advice as to the form of the security offered.   It seemed little concerned about security for the note in suit, and its officers do not pretend to say that intervener was present when it is claimed that Crahan agreed to give a second mortgage upon the attached property to secure the note in suit.   As between intervener and Melvin, there is a square conflict in the testimony and some things in corroboration of the story of each.   The trial court seems to have accepted intervener's version of the matter, and we are not disposed to reverse the judgment because it did so.

The question of notice by either of the parties as to the claims of the other is not regarded as very material, for, after all, the question here is: Did plaintiff secure anything through the levy of its attachment?   It obtained just what interest Crahan had in the attached property, and no more, for, as an attaching creditor, it is not a purchaser, and it has no greater rights than Crahan had at the time the attachment was levied, no matter if these rights or obligations were not of record.   These propositions are so fundamental as not to require the citation of authorities in their support.   But see *Rea v. Wilson,* 112 Iowa, 519; *Welton v. Tizzard,* 15 Iowa, 495.

*3. SAME: rights acquired by attachment.*

Even if intervener's rights be purely equitable in character, they will prevail over an attachment of the land.   It

is manifest that intervener furnished the consideration for the attached property, and we are satisfied with the conclusion of the trial court that it was to be conveyed to him by Crahan at the time the transactions were closed up. True, the conveyance was to be of the legal title as security only, as the Kansas land had been; but intervener was in equity entitled to a deed of the property on February 18, 1904, which was some time before the attachment was levied. Such a deed had been prepared, and was not executed because of the absence of Crahan's wife. The deed was not finally executed and delivered until after the attachment was run, but intervener had an equity in the land antedating the attachment, and, as equity regards that as done which should have been done, absence of a deed does not defeat intervener's equitable title or lien upon the property. It is doubtless true that Crahan was playing double in the transaction. We must conclude that he promised to give a second mortgage on the property to secure the note made by him and Melvin to the bank; but intervener had no knowledge of this, and, even if he had, he would not be bound in this action, except on the theory of an estoppel, and it is doubtful if he would be estopped as against plaintiff, who is a mere attaching creditor.

Plaintiff strenuously insists, however, that intervener was not a competent witness as to any personal transactions or negotiations with the deceased, Crahan. It is true that he is a party, and is interested in the suit; but the action is not by or against the executor, administrator, heir at law, etc., of a deceased person as such. The controversy is between plaintiff, a creditor of deceased, who attached certain property, and one who intervened claiming to own the same; and the mere fact that the administrator was a party defendant in the original suit does not disqualify the intervener from testifying in an action brought by such creditor. The administrator is an indifferent party to the suit, and the statute

4. EVIDENCE: transactions with one since deceased.

(code, section 4604) does not apply to such cases. *Drake v. Painter,* 77 Iowa, 731; *Clark v. Ross,* 96 Iowa, 402; *Gordon v. Kennedy,* 36 Iowa, 167; *McClintic v. McClintic,* 111 Iowa, 615; *Shuman v. Lodge,* 110 Iowa, 480.

Again, it is argued with much confidence that the burden was and is upon intervener, and that he failed to meet this burden. That he had and has the burden is clear from the facts and issues above recited, but whether or not he has met this burden is an entirely different question. The trial court thought he

5. INTERVENTION: burden of proof.

had, and this finding has the force and effect of a verdict of a jury, and we shall not interfere. The administrator of Crahan's estate filed an answer admitting the allegations of intervener's petition of intervention. This he was, perhaps, not authorized to do; but this form of pleading is of no consequence, for we have already pointed out what the issues really were.

Again, it is said that intervener's testimony is incompetent, because it created a parol interest or trust in lands. This is not argued with much seriousness, and we therefore need not give it great consideration. There are two answers to the proposition; first, intervener had paid the consideration for the land, and this was sufficient to remove the bar; second, he immediately went into the possession of the property theretofore owned by Smith.

6. TRUSTS: evidence.

We have gone over the record, which is somewhat confusing, with care, and find no reason for interfering with the judgment.

It is therefore *affirmed.*